OPINION OF THE COURT
Michael D. Stallman, J.
This action challenges the constitutionality of New York City’s Cabaret Law and provisions of the New York City Zoning Resolution which, taken together, regulate the circumstances under which participatory social dancing may be permitted in eating and drinking establishments, and the location of those establishments throughout New York City. It requires consideration of whether, and to what extent, the City may regulate social dancing in restaurants, clubs, and bars. At issue is whether participatory social dancing, as an activity, constitutes protected speech under the New York State Constitution.
Plaintiffs seek a preliminary injunction to prevent the City from enforcing the Cabaret Law and Zoning Resolution, to the extent that they relate to participatory dancing. The City cross-moves for summary judgment dismissing the action.
Background
Section 20-360 of the Administrative Code of the City of New York, familiarly known as the City’s Cabaret Law, requires cabarets to be licensed. The local law defines a cabaret as
“[a]ny room, place or space in the city in which any musical entertainment, singing, dancing or other form of amusement is permitted in connection with the restaurant business or the business of directly or indirectly selling to the public food or drink, except eating or drinking places, which provide incidental musical entertainment, without dancing, either by mechanical devices, or by not more than three persons.”[1] (Administrative Code § 20-359 [3] [emphasis supplied].)
Briefly stated, the process of obtaining a cabaret license begins with the Department of Consumer Affairs (DCA). An eating or *468 drinking establishment seeking a cabaret license must demonstrate, among other things, that the establishment is located in a zoning district permitting such use. The establishment maybe inspected for compliance with all applicable fire and safety regulations and the electrical and building codes. The community board in whose district the proposed cabaret sits may provide DCA with any relevant information about the applicant. The community board may negotiate terms of operation with an applicant.
Plaintiffs John Festa, Byron Cox, Ian Dutton, Meredith Stead, and the Gotham West Coast Swing Club all claim involvement with participatory social dancing. By social dancing, plaintiffs mean dancing that occurs among the patrons of an eating or drinking establishment with entertainment, done for the patrons’ own pleasure, with only incidental benefit, if any, to observers. Plaintiffs distinguish social dancing from dance performance, whether by professionals or performers for an audience. Plaintiffs do not define social dancing, but they list several categories of social dancing in which they engage: ballroom, swing and West Coast swing, country-western, tango, house/ goth, and Latin.
Festa, Cox and Stead have engaged in social dancing as participants, dance instructors and performers. Dutton is a social dancer and one of the founders of a nonprofit collective which sponsors goth/industrial social dances. The Gotham West Coast Swing Club, a nonprofit corporation, promotes West Coast swing dances and sponsors social dances for its members.
The City Planning Commission (CPC) oversees the Zoning Resolution; the Department of Buildings (DOB) enforces the building and electrical codes; DCA enforces the Cabaret Law and issues summonses to eating and drinking establishments which permit social dancing without a cabaret license.
This case concerns only uncompensated participatory social dancing by adults. It does not involve any type of performance, instruction, or remuneration. It does not involve persons under age 18. It does not involve nudity or so-called “adult entertainment.”
Contentions
Plaintiffs contend that social dancing constitutes expression protected under New York State’s Constitution, and that the *469 City’s Cabaret Law and zoning requirements infringe upon their right of expression. Plaintiffs also contend that the restrictions are arbitrary and capricious, denying them due process of law.
The City contends that participatory social dancing is not expressive conduct, relying on cases interpreting the First Amendment of the United States Constitution. The City asserts that the court should look to First Amendment cases in deciding whether social/recreational dancing is protected under New York’s Constitution.
I.
Article I, § 8 of the New York State Constitution states, in relevant part: “Every citizen may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of that right; and no law shall be passed to restrain or abridge the liberty of speech or of the press.” The free speech provision first appeared in New York’s Constitution of 1821, as part of the State’s Bill of Rights, “which was essentially based on the Bill of Rights contained in the United States Constitution.” (SHAD Alliance v Smith Haven Mall, 66 NY2d 496, 500 [1985].) Any interpretation of New York’s Free Speech Clause should thus begin with a discussion of its federal antecedent.
To determine whether conduct constitutes expressive speech under the First Amendment, the court must first inquire “whether [a]n intent to convey a particularized message was present, and [whether] the likelihood was great that the message would be understood by those who viewed it.” (Texas v Johnson, 491 US 397, 404 [1989] [internal quotation marks omitted], quoting Spence v Washington, 418 US 405, 410-411 [1974].) Though the message must be particularized, “an activity need not necessarily embody ‘a narrow, succinctly articulable message.’ ” (Church of Am. Knights of Ku Klux Klan v Kerik, 356 F3d 197, 205 n 6 [2d Cir 2004] [citation omitted].) Otherwise, the United States Constitution would never reach “the unquestionably shielded painting of Jackson Pollock, music of Arnold Schoenberg, or Jabberwocky verse of Lewis Carroll.” (Hurley v Irish-American Gay, Lesbian & Bisexual Group of Boston, Inc., 515 US 557, 569 [1995].)
A.
In Barnes v Glen Theatre, Inc. (501 US 560 [1991]), the United States Supreme Court confronted the issue of whether dance constitutes expressive conduct, in the context of deciding *470 whether so-called “nude dancing” (i.e., sexually oriented performances by nude dancers) was entitled to some level of First Amendment protection. Chief Justice Rehnquist and Justices O’Connor and Kennedy considered nude dancing as expressive conduct “within the outer perimeters of the First Amendment,” although “only marginally so.” (Barnes, 501 US at 566.) Justice White, in a dissenting opinion joined by Justices Marshall, Blackmun, and Stevens, recognized that dance “inherently embodies the expression and communication of ideas and emotions.” (Id. at 587 [citation omitted].) Justice White quoted the opinion of the lower court, which explained how literature abounds with references to the expressive nature of dance:
“Dance has been defined as ‘the art of moving the body in a rhythmical way, usually to music, to express an emotion or idea, to narrate a story, or simply to take delight in the movement itself.’ 16 The New Encyclopedia Britannica 935 (1989). Inherently, it is the communication of emotion or ideas. At the root of all ‘[t]he varied manifestations of dancing . . . lies the common impulse to resort to movement to externalise states which we cannot ex-ternalise by rational means. This is basic dance.’ Martin, J. Introduction to the Dance (1939). Aristotle recognized in Poetics that the purpose of dance is ‘to represent men’s character as well as what they do and suffer.’ The raw communicative power of dance was noted by the French poet Stéphane Mallarmé who declared that the dancer ‘writing with her body . . . suggests things which the written work could express only in several paragraphs of dialogue or descriptive prose.’ ” (Id. at 587 n 1 [White, J., dissenting], quoting Miller v Civil City of S. Bend, 904 F2d 1081, 1087 [7th Cir 1990].)
Barnes must be read together with the United States Supreme Court’s earlier decision in Dallas v Stanglin (490 US 19 [1989]). In Stanglin, the operator of a roller skating rink challenged a Dallas ordinance that prohibited dance halls from allowing adults to enter or remain in dance halls being used by persons between the ages of 14 and 18. The Texas Court of Appeals struck down the ordinance as violative of First Amendment associational rights of minors. The United States Supreme Court reversed, ruling that limiting the ability of minors and adults to dance with each other does not “involve the sort of expressive association that the First Amendment has been held to protect.” (Id. at 24.) The Court then stated:
*471 “It is possible to find some kernel of expression in almost every activity a person undertakes — for example, walking down the street or meeting one’s friends at a shopping mall — but such a kernel is not sufficient to bring the activity within the protection of the First Amendment. We think the activity of these dance-hall patrons — coming together to engage in recreational dancing — is not protected by the First Amendment. Thus this activity qualifies neither as a form of ‘intimate association’ nor as a form of ‘expressive association’ as those terms were described in Roberts [v United States Jaycees, 468 US 609 (1984)].” (Ibid.)
“Although the Court in Stanglin did not expressly state that recreational dancing was not protected by the First Amendment, the analysis and holding of the Stanglin court make such a conclusion inescapable.” (Willis v Town of Marshall, N.C., 426 F3d 251, 257 [4th Cir 2005]; accord Walker v City of Kansas City, Mo., 911 F2d 80, 88 [8th Cir 1990], cert denied 500 US 941 [1991].) The right of expressive association derives from the right to engage in protected First Amendment activities. (Roberts, 468 US at 618.) Thus, in deciding that recreational dancing did not involve expressive association, the Stanglin court implicitly determined that it was not expressive.
In sum, the Supreme Court has interpreted the First Amendment so as to protect dance performances as expressive conduct, while carving out an exception for “nude dancing.” Its interpretation does not protect participatory recreational dancing.
B.
To understand the dichotomy between dance performance and recreational/social dancing, one must look at how the courts have characterized the latter. Before and after Stanglin, courts have not considered recreational dancing as either sufficiently expressive or communicative so as to rise to the level of expressive speech. In Jarman v Williams (753 F2d 76, 78 [8th Cir 1985]), the court held that recreational or social dancing conveys no message, “unless it be the message that the plaintiffs do not believe that dancing is wrong.” In Barnes, Justice Souter equated social dancing to aerobic exercise. (Barnes, 501 US at 581.) Similarly, prior to Stanglin, a New York State court classified recreational dancing as a noncommunicative, physical activity, citing cases involving roller skating: “[I]t seems inescapable that petitioners’ patrons primarily use the facilities for physical *472 exercise and personal pleasure; [the] element of communication between an artist or performer and his audience seems entirely lacking.” (Kent’s Lounge v City of New York, 104 AD2d 397, 398 [2d Dept 1984], quoting Sunset Amusement Co. v Board of Police Commrs., 7 Cal 3d 64, 74, 496 P2d 840, 846 [1972].) In Stanglin, the majority appears to consider recreational/social dancing as expressive as walking down the street or meeting friends at the mall. (Stanglin, 490 US at 24.)
Plaintiffs submit that none of the federal cases gave social dancing its due, because the courts did not engage in a considered reflection on the aesthetic and communicative interests of the social dancing participants themselves. Plaintiffs assert that social dancing participants are engaged in nonverbal communication through touch and movement, whether the dancing involves the Argentine tango or house dance. (See Stead affidavit HH 9-11; Karako affidavit HH 8-10; Cox affidavit 1Í 7.) They also claim that social dancing expresses the joy of people in a shared experience, and, as a social ritual, is an expression of the culture that does the dance. (Taylor-Corbett affidavit H 11; Harwood affidavit H 3; Dutton affidavit HI.) From a sociological perspective, dance can be a signifier, communicating identity, origin, or relationship. (See Fikentscher affidavit H 12; Malnig affidavit H 4; McFadin affidavit H 10.) Plaintiffs cite the cakewalk, a dance invented by African-American dancers that parodied the “high life” of white social dancing. During the late seventeenth through nineteenth centuries, social dancing skill was regarded as a trait and expression of “gentleman” status for men of the upper class. (Harwood affidavit H 4.) Dances in Africa were performed for ritualistic purposes — for crops, rain, fertility, morale, or spiritual cleansing. (Flores affidavit H 5.)
Several affiants discuss the reciprocal influences of music and social dancing, from a historical and cultural perspective. (See generally Beckerman affidavit; Sublette affidavit.) For example, certain music styles drew upon real or imagined folk dances as inspiration, as in Russian, Czech, and Hungarian music. (Beckerman affidavit H 7.) Plaintiffs claim that Latin music in New York, classified as Afro-Cuban or Afro-Caribbean, is “made for dancing.” (Sublette affidavit HH 4-6; Flores affidavit H 6.) The granddaughter of Duke Ellington states that the jazz great wrote most of his music for dancers. (Ellington affidavit H 3.)
Finally, plaintiffs view the dichotomy between dance performance and social dancing as artificial. (See e.g. Fikentscher affidavit H 17.) Several choreographers and dancers maintain that *473 social dancing and dance performance inspire one another. (Festa affidavit 1Í14; Martins affidavit; Ellington affidavit 1Í 3; Taylor-Corbett affidavit 1Í1Í 7-10.) Plaintiffs point out that such a dichotomy does not exist with respect to music, which is constitutionally protected whether the musicians are performing on stage or playing for themselves.
In short, plaintiffs characterize the constitutional jurisprudence on social dancing and dance performance as “a wrong turn in federal law.” (Plaintiffs opposition mem at 9.)
n.
“The protection afforded by the guarantees of free press and speech in the New York Constitution is often broader than the minimum required by the First Amendment.” (O’Neill v Oakgrove Constr., 71 NY2d 521, 529 n 3 [1988] [granting journalists a qualified privilege of confidentiality].) “This State, a cultural center for the Nation, has long provided a hospitable climate for the free exchange of ideas.” (Immuno AG. v Moor-Jankowski, 77 NY2d 235, 249 [1991] [letter to the editor expressing opinions not actionable as defamation].) “The function of the comparable provisions of the State Constitution, if they are not to be considered purely redundant, is to supplement those rights to meet the needs and expectations of the particular State.” (People ex rel. Arcara v Cloud Books, 68 NY2d 553, 557 [1986] [closure of adult bookstore infringed upon State’s constitutional guarantee of freedom of expression].)
Plaintiffs urge that the court interpret New York’s Constitution to embrace that which the United States Supreme Court rejected — classification of participatory social dancing as expressive conduct. Plaintiffs essentially contend that, because of its cultural and social importance, social dancing should not be restricted.
No one here disputes the worth of social dancing. Neither does the City dispute plaintiffs’ anthropological and historical overview of the centrality of dance in the development of the arts. However, to be clear, plaintiffs are not claiming that the social dancing that they engage in is primarily intended to inspire musicians and choreographers, to assert a cultural identity, or to engage in a ritual with an intended purpose, such as making rain or promoting fertility. On the contrary, by social dancing, plaintiffs refer to “dancing done for aesthetic and com *474 municative pleasure of the dancers, with incidental benefit to those watching.” (Chevigny affirmation 1f 2.)[2]
Extending the protection of New York’s Constitution to social dancing is not a simple matter. Although plaintiffs emphasize the relationship between dance and music, the two cannot be equated. All music, performance or otherwise, is considered a form of expression and communication protected under the First Amendment. (Ward, v Rock Against Racism, 491 US 781, 790 [1989].) Dancing has not been regarded as a form of speech, but rather as conduct. As the Supreme Court recognized in Stanglin, on some level, all conduct is expressive. (Stanglin, 490 US at 24.) “[E]very voluntary act implies some such idea, and the implication is thus so common and minimal that calling all voluntary activity expressive would reduce the concept of expression to the point of the meaningless.” (Barnes, 501 US at 581 [Souter, J.].)
Dancing, whether dance performance or social dancing, involves physical activity. Plaintiffs assert that social dancing is expressive and communicative, but offer no consistent, practical framework that would classify social dancing as expressive conduct while excluding other physical, athletic, or recreational activities that are arguably similar to social dancing. Indeed, in Barnes, Justice Souter saw no distinction between social dancing and aerobics, which is physical activity performed to music.
Plaintiffs propose that social dancing is expressive conduct due only to the “esthetic and communicative pleasure” between the participants. Under that standard, many recreational and social activities arguably could be constitutionally protected as well, such as gymnastics or figure skating. Indeed, most nonprofessional participatory group sports involve a high degree of skill and social interaction, and give pleasure as much from good form, and from how the game is played, as from victory or the thrill of competition. Even smokers have argued that smoking together says: “Relax, I’m your friend.” (See NYC C.L.A.S.H., Inc. v City of New York, 315 F Supp 2d 461, 479 n 12 [SD NY 2004].) Plaintiffs’ proposed standard is overinclu *475 sive; it would significantly depart from the level of expressiveness and communication required by the federal standard.[3]
Social dancing can play a role in socialization and courtship, but the degree of expressive communication in social dancing varies; it does not lend itself easily to qualitative or quantitative analysis. It is beyond this court to fix a degree of expressive communication for constitutional challenges that would, in all instances, apply only to social dancing but exclude other similar recreational activities, without resorting to suspect content-based classifications. It is not for the court to pass judgment as to whether, for instance, “clowning” and “krumping” are more expressive than the Argentine tango, or to split hairs in deciding the circumstances under which social dancing could rise to a degree of constitutionally protected expression. A case-by-case approach to social dancing would be impracticable.
Although article I, § 8 of the New York Constitution has been interpreted more broadly than its federal counterpart in some circumstances, the court declines to do so here. (See Courtroom Tel. Network LLC v State of New York, 5 NY3d 222, 232 [2005] [no right to televise a trial under free speech provision of New York’s Constitution].)
m.
“Legislative enactments are entitled to a strong presumption of constitutionality. While the presumption is not irrefutable, parties challenging a duly enacted statute face the initial burden of demonstrating the statute’s invalidity beyond a reasonable doubt.” (Dalton v Pataki, 5 NY3d 243, 255 [2005] [citations and internal quotation marks omitted].) “The exceedingly strong presumption of constitutionality applies not only to enactments of the Legislature but to ordinances of municipalities as well.” (Lighthouse Shores v Town of Islip, 41 NY2d 7, 11 [1976].)
In the substantive sense, due process limits government’s legislative and executive action, and the “criteria to identify what is fatally arbitrary differ depending on whether it is legislation or a specific act of a governmental officer that is at issue.” *476 (County of Sacramento v Lewis, 523 US 833, 846 [1998].) “When a statute is challenged on nonprocedural grounds as violative of due process of law the question is whether there is some fair, just and reasonable connection between it and the promotion of the health, comfort, safety and welfare of society.” (Health Ins. Assn. of Am. v Harnett, 44 NY2d 302, 310 [1978].) “[I]n order to be held constitutional, a law which places some restriction upon an individual’s freedom of action in the name of the police power must bear some reasonable relation to the public good.”[4] (Matter of Dobrzenski v Village of Hamburg, 277 AD2d 1005, 1005-1006 [4th Dept 2000].)
Plaintiffs contend that the Cabaret Law cannot pass the reasonable relationship test, because the objective of the City’s Cabaret Law reflected a puritanical suspicion of the effect of popular dance. (See City of Baxter Springs v Bryant, 226 Kan 383, 598 P2d 1051 [1979]; Crosby v Inhabitants of Town of Ogunquit, 468 A2d 996 [Me 1983].) In 1926, when it recommended enactment of the Cabaret Law, the Committee on Local Laws stated, in pertinent part:
“These night clubs are simply dance halls, where food is served at exorbitant prices to the tune of jazz and tabloid entertainments. A very frank opposition was voiced by one of the licensees, on the ground that when strangers came to New York City they wanted to ‘run wild.’ Well, there has been altogether too much running ‘wild’ in some of these night clubs and, in the judgement of your Committee, the ‘wild’ stranger and the foolish native should have the check-rein applied a little bit. It is well known that the ‘wild’ strangers are not at all interested in our great museums of art and history, in our magnificent churches and public libraries, our splendid parks and public monuments. They are interested in speak-easies and dance halls and return to their native heaths to slander New York.
“Your Committee believes that these ‘wild’ people *477 should not be tumbling out of these resorts at six or seven o’clock in the morning to the scandal and annoyance of decent residents on their way to daily employment.” (Proceedings of Bd of Aldermen & Mun Assembly of City of NY, Recommendation No. 10, Dec. 7, 1926, at 572.)
Plaintiffs allege that the City has singled out dancing for licensing and zoning to control noise and crowding, but they claim that dancing, in itself, has no connection to crowding and noise. Plaintiffs also contend that the licensing system is so arbitrary as to be unconstitutional, because the Administrative Code contains no provisions limiting DCA’s discretion to grant cabaret licenses.
Plaintiffs have not rebutted the presumption of the constitutionality of the City’s Cabaret Law. The quoted rationale for the Cabaret Law may seem anachronistic. However, a law will not be struck down on the basis of an alleged illicit legislative motive, if it is otherwise constitutional. (United States v O’Brien, 391 US 367, 383 [1968]; People v Stover, 12 NY2d 462, 466 [1963].) Here, the legitimate purpose of the City’s licensing requirements includes the protection of the health and safety of the people of New York City. (See Administrative Code § 20-101.) Any eating or drinking establishment seeking a cabaret license must be inspected by the New York City Fire Department (FDNY) and DOB for compliance with all applicable fire and safety regulations, and the electrical and building codes. (See Pico affidavit If If 4-5. )[5] Although all buildings and places of assembly must comply with applicable codes, the additional burden of verifying compliance is justified where there is risk of injury and loss of life in establishments which offer dancing. (See People v DiLorenzo, 149 Misc 2d 791 [Crim Ct, Bronx County 1990] [arson fire at Happy Land Social Club, which had prior building code violations, killed 87 people].)
A licensing requirement for eating and drinking establishments that offer participatory social dancing is not arbitrary. Simply because an establishment may conform to building and fire codes does not assure that its space is adequate or appropriate for social dancing. Indeed, common sense teaches that such activity be conducted in space, and under circumstances, safe *478 for dancers, nondancers, and establishment employees, especially if dancing patrons are also sharing space with seated patrons who are eating or drinking.[6]
To the extent that plaintiffs contend that DCA has acted arbitrarily in denying cabaret licenses, any challenge to a particular license denial must be timely brought in a separate CPLR article 78 proceeding. Plaintiffs apparently lack standing to raise such a challenge and may not do so here. The allegedly arbitrary denial of any particular cabaret license is not a basis for invalidating the entire Cabaret Law as arbitrary.
Plaintiffs’ reliance on Chiasson v New York City Dept. of Consumer Affairs (132 Misc 2d 640 [Sup Ct, NY County 1986] [Chiasson I]) is misplaced. In that action, which involved a prior version of the Cabaret Law, the court found that the City failed to articulate a legitimate interest in restricting performance of live music to piano, organ, accordion, guitar or any stringed instrument. The court later invalidated the portion of the Cabaret Law which restricted performance of live music to not more than three musicians. (Chiasson, 138 Misc 2d 394 [1988], supra [Chiasson II].)[7] Because music is recognized as expression that is constitutionally protected under the First Amendment, the Chiasson court’s scrutiny was exacting, and the City did not present evidence that the restriction related to the City’s concerns of traffic congestion and noise. In contrast, the social dancing here at issue is not recognized as expressive communication by either the First Amendment or the Free Speech Clause of New York’s Constitution.
Thus, the City does not here need to make a specific evidentiary showing that the licensing requirement bears a reasonable relationship to the public’s health and safety. A presumption arises that “the Legislature has investigated and found facts necessary to support the legislation as well as the existence of a situation showing or indicating its need or desirability.” (Big Apple Ice Cream v City of New York, 7 AD3d 282, 283 [1st Dept 2004], quoting Hotel Dorset Co. v Trust for Cultural Resources of City of N.Y., 46 NY2d 358, 370 [1978].) The Chiasson court *479 understood that “[a] licensing scheme which ensures that the regulated activity conforms to certain health and safety requirements will be upheld.” (Chiasson I, 132 Misc 2d at 645.)
As a practical matter, participatory social dancing cannot be treated the same way as live music performance. Space appropriate for music may be inappropriate for dancing. Musicians can play in spaces smaller than those safe and convenient for dancing. Musicians are generally stationary; dancers ordinarily move, and depending on the form of the dance, may traverse significant floor area.
Plaintiffs’ other cited cases are inapposite. (See City of Baxter Springs v Bryant, 226 Kan 383, 598 P2d 1051 [1979], supra; Crosby v Inhabitants of Town of Ogunquit, 468 A2d 996 [1983], supra; Russell v Town of Pittsford, 94 AD2d 410 [4th Dept 1983]; Kemo, Inc. v City of Long Beach, 47 Misc 2d 185 [Sup Ct, Nassau County 1965].)[8]
In sum, the Cabaret Law is reasonably related to public safety and welfare. Assuming, for argument’s sake, that plaintiffs have a due process interest that the Cabaret Law restricts, plaintiffs have not demonstrated that the Cabaret Law is so arbitrary that it violates substantive due process. Accordingly, plaintiffs’ challenge to the City’s Cabaret Law as unconstitutional, on its face and as applied, fails.

m

The Zoning Resolution classifies the City according to three basic zoning categories (residential, commercial [C] and manufacturing), which are further classified into lower, medium, and higher density residential, commercial and manufacturing *480 districts. Each zoning classification regulates, among other things, permitted uses and the height and bulk of buildings in relation to lot size.
The Zoning Resolution sets forth the uses permitted in commercial districts, which fall into one or more of 18 use groups, and the uses listed in each use group have common functional or nuisance characteristics.[9] Use group 6 includes eating or drinking establishments offering entertainment, but not dancing, having a capacity of less than 200 people. Use group 12 includes eating or drinking establishments of any capacity which offer dancing, as well as eating and drinking establishments having a capacity of more than 200 people offering entertainment. These establishments are restricted to four commercial zoning districts: C4, C6, C7, and C8.
Plaintiffs contend that the application of the zoning provisions is arbitrary and capricious and deprives them of due process of law guaranteed under article I, § 6 of the New York State Constitution. Because social dancing is not constitutionally protected as expressive conduct, the validity of the City’s Zoning Resolution provisions challenged here must be measured against less rigorous standards of due process. (See e.g. America’s Best Family Showplace Corp. v City of New York, Dept. of Bldgs., 536 F Supp 170, 174 [ED NY 1982].)
Municipalities have been accorded broad powers to control land use through zoning laws that are “rationally related to legitimate state concerns and [do] not deprive the owner of economically viable use of his property.” (Schad v Borough of Mount Ephraim, 452 US 61, 68 [1981].) Zoning laws will be upheld if reasonable and if they find their justification in some aspect of the police power asserted for the public welfare. (See Village of Belle Terre v Boraas, 416 US 1 [1974]; Village of Euclid v Ambler Realty Co., 272 US 365 [1926].)
“In order for a zoning ordinance to be a valid exercise of the police power it must survive a two-part test: (1) it must have been enacted in furtherance of a legitimate governmental purpose, and (2) there must be a ‘reasonable relation between the *481 end sought to be achieved by the regulation and the means used to achieve that end.’ If the ordinance fails either part of this test, it is unreasonable and constitutes a deprivation of property without due process of law under our State Constitution.” (McMinn v Town of Oyster Bay, 66 NY2d 544, 549 [1985] [citation omitted].)[10]
“[L]and-use regulations generally enjoy a strong presumption of constitutionality as valid exercises of the State’s police power to advance the public health, safety and welfare. Thus, even if the validity of a provision is ‘fairly debatable,’ the municipality’s judgment as to its necessity must control.” (Stringfellow’s of N.Y. v City of New York, 91 NY2d 382, 395-396 [1998] [citations omitted].)
Plaintiffs object to dancing being listed in use group 12. Plaintiffs assert that the purpose of use group 12 is to control crowding and noise, and that the City cannot prove a nexus between dancing in itself and crowding or noise.[11] Plaintiffs regard the commercial zoning districts for use group 12 as unsuitable locations for dancing. Plaintiffs argue that patrons should be permitted to dance wherever an establishment lets them dance, irrespective of zoning restrictions.[12]
The City’s stated purposes for the creation of commercial districts are found in the Statement of Legislative Intent of the Zoning Resolution, which sets forth the following relevant purposes:
“(a) to provide sufficient space, in appropriate locations in proximity to residential areas, for local retail development catering to the regular shopping needs of the occupants of nearby residences, with due allowance for the need for a choice of sites; . . .
“(c) to protect both local development and nearby residences . . . against offensive noise [and] víbra *482 tion . . . ;
“(d) to protect both local retail development and nearby residences against congestion ... by regulating the intensity of local retail development, by restricting those types of establishments which generate heavy traffic . . .
“(h) to provide sufficient space in appropriate locations for all types of commercial and miscellaneous service activities; with due allowance for the need for a choice of sites; . . .
“(k) to promote the most desirable use of land and direction of building development in accord with a well-considered plan,... to protect the character of the district and its peculiar suitability for particular uses” (NY City Zoning Resolution § 31-00).
These purposes are consistent with promoting health, safety, and welfare of New Yorkers.
According to the City, eating or drinking establishments which provide unrestricted entertainment and dancing tend to have a much wider service area, attracting larger numbers of people for varying lengths of time, thereby posing problems of increased pedestrian and vehicular traffic, with resultant congestion and increased noise. In the view of the City Planning Commission and the City Council, these establishments are not suited to be located in residential neighborhoods, where eating and drinking establishments with a capacity of less than 200 people are located. Hence, the City categorizes dancing in use group 12, which includes, for example, bowling alleys, skating rinks, and retail stores like delicatessens and music stores, rather than use group 6, which include the neighborhood restaurant or bar and grill.
Whether dancing, as an activity in itself, causes noise and crowding is not the issue. Rather, the issue is whether the presence of additional people who wish to dance may cause increased noise and congestion in certain places. Plaintiffs state that they will hold dances only in bars or similar venues, because the atmosphere of such places is “part of the expression of the dance style . . . Adults want to interact in a place where we can buy a cocktail or sit and talk.” (Festa affidavit 1Í 6; see also Karako affidavit V 8 [“dancing is a night out . . . many of the songs to which the tango is done are about a bar and tango”].) It is self-evident that bars, clubs and restaurants can generate noise, especially when patrons consume alcohol, and smokers and others *483 awaiting entry congregate outside. If these establishments draw more people because they offer dancing, then there is a greater likelihood of pedestrian traffic, increased vehicular traffic, and associated noise.
Plaintiffs see no problem if they were to dance in an otherwise sparsely occupied bar or restaurant, and the owner does not object. It suffices to say that the policymaker has already weighed the consequences of unregulated dancing (with the owner’s permission) in eating and drinking establishments. In any event, because it is debatable whether dancing should have been restricted to use group 12, the City’s judgment cannot be considered arbitrary or irrational. (See Stringfellow’s of N.Y., 91 NY2d at 395.)[13]
The Zoning Resolution is a carefully considered, complex, and critical component of the City land use plan, capable of evolving to meet changing conditions and needs. It provides a structure for resolving conflicting private and public interests. The Zoning Resolution is the product of a long, intensive process of investigation by the Department of City Planning, deliberation by the City Planning Commission and the City Council and vetting by community boards, elected officials, and neighborhood, business, preservationist and other interested groups. It should not be lightly disturbed based on the limited concerns of one group of litigants, especially when unrepresented nonparties may be affected.
Accordingly, plaintiffs’ constitutional challenge to the Zoning Resolution fails. The challenged Zoning Resolution provisions are a reasonable exercise of the police power and bear a substantial relationship to the health, safety and general welfare of New Yorkers.
V
The action must be dismissed for lack of any viable constitutional claim either as to the Cabaret Law or to the Zoning Resolution. Dismissal of the action automatically requires denial of plaintiffs motion for a preliminary injunction. “It is well settled that the pendency of a viable action is an indispensable prereq *484 uisite to the granting of a preliminary or temporary injunction.” (Uniformed Firefighters Assn. of Greater N.Y. v City of New York, 173 AD2d 206, 206 [1st Dept 1991], affd 79 NY2d 236 [1992].)
VI.
The ethnic and cultural mix, and openness to innovation and diversity, which virtually define New York’s uniqueness, encourage an unparalleled variety of popular culture and entertainment. New Yorkers’ thirst for new, different, and trendy outlets for entertainment, recreation and socializing sustains existing establishments and prompts entrepreneurs to open new ones. Proliferation of new entertainment outlets may stimulate the City’s economic development but it presents challenges. New restaurants, clubs and bars may cause a “buzz,” attracting people and other businesses to revitalize neighborhoods, but can simultaneously intrude on existing businesses and residents and alter the character of residential neighborhoods.
Social dancers have an understandable desire for sufficient, convenient, suitable venues in which they may dance. The City has a legitimate public interest in regulating bars, clubs, and restaurants and the circumstances under which they may offer patrons the opportunity to dance. Government may act reasonably to protect patrons from potentially dangerous premises conditions. Government may also act reasonably to protect local residents from excessive noise, congestion, traffic, and the associated effects of alcohol consumption, especially late at night in residential areas.
Social dancing is fun; it is also a worthwhile and socially positive activity whose importance should not be underestimated simply because it is enjoyable. The 80-year-old Prohibition-era Cabaret Law and its interface with zoning laws might well be reexamined in light of current social norms and neighborhood conditions. Given New York’s size and diversity, it would be appropriate to assess how social dancers’ desire for more venues can be balanced with other development and neighborhood needs. The City might then consider amending the current law and/or adopting rules that could give greater flexibility to the current system.[14]
*485 The City can take the lead by finding a way to accommodate more opportunities for participatory social dancing. Surely, the Big Apple is big enough to find a way to let people dance.
Conclusion
Accordingly, it is hereby ordered that plaintiffs’ motion for a preliminary injunction is denied; and it is further ordered that defendants’ cross motion is granted, and the complaint is dismissed.

. Section 20-369 (3) has been held unconstitutional under the First Amendment of the United States Constitution to the extent that it defines a cabaret as a place which provides live music performed by not more than three persons. (Chiasson v New York City Dept, of Consumer Affairs, 138 Misc *468 2d 394 [Sup Ct, NY County 1988].) It appears that the Administrative Code has not been revised to reflect the court’s ruling. (See section III, infra.)

. Although plaintiffs cite the examples of clowning and krumping, popular Los Angeles dance forms they claim to be aesthetic expressions of violence and poverty (see Malnig affidavit 11 7), plaintiffs’ own social dancing consists of ballroom dancing, swing and West Coast swing, country-western, tango, and Latin dancing. The court doubts that these categories of plaintiffs’ social dancing can be readily understood as conveying a particular sociocultural condition or ties to a social group.

. People who are passionate about their avocation — be it dancing or any other hobby — do not view it solely as entertainment. Rather, they may appreciate it as a means of self-actualization — something that helps make them who they are and helps make their lives fulfilling. Irrespective of how self-expressive and socially positive that may be — or how communicative of those qualities that it may be to others — it does not make the activity, or its practice in a public space, the kind of constitutionally protected expression or expressive association currently understood by our jurisprudence.

. The Cabaret Law can be viewed as restricting both an individual’s freedom to dance and an establishment owner’s decision to offer patrons the opportunity to dance. Inasmuch as plaintiffs are only patrons of such establishments, the court does not discuss the constitutional exercise of police power as it pertains to affected owners. (See e.g. de St. Aubin v Flacke, 68 NY2d 66, 77 [1986]; Modjeska Sign Studios v Berle, 43 NY2d 468 [1977].) The City questions whether plaintiffs, as recreational dancers only, may challenge the licensing requirement, but the City does not set forth any argument that plaintiffs lack standing.

. FDNY inspections Eire not required if DOB has issued a current place of assembly permit for the premises. (Pico affidavit 1t 4.) DOB inspections are not required if the certificate of occupany is less than three months old, and a licensed electrician may submit a sworn affidavit of compliance with current electrical building codes in lieu of the inspection. (Id. 115.)

. Among other things, it would not be arbitrary to consider dance floor area, floor surface, height differential, proximity to steps or stairs, lighting conditions, internal foot traffic patterns (e.g., to and from kitchens and restrooms), placement of tables and other obstructions, and means and routes of egress.

. It appears that the Cabaret Law has not been revised to reflect the court’s ruling in Chiasson II.

. In Bryant, the City of Baxter Springs, Kansas, enacted an ordinance prohibiting social dancing in places serving liquor. In Crosby, the Town of Ogunquit, Maine, enacted an ordinance applicable only to liquor licenses, prohibiting all indoor entertainment except for dancing and nonamplified live music. In both cases, the municipalities admitted that the avowed purpose of the ordinances was to make bars less attractive to its citizens. Unlike Bryant and Crosby, the City of New York does not make a similar claim. The Cabaret Law is not directed solely at bars, because the definition of a cabaret may apply to restaurants as well. The remaining cases upon which plaintiffs rely neither refine the reasonable relationship test nor involve social dancing. In Kemo, Inc., the court invalidated an ordinance applicable to supper club and cabaret licensees partly on the grounds of equal protection, because the ordinance, which did not permit entertainment after 11 P.M., did not apply to hotels and catering establishments offering entertainment. Russell involved an ordinance which prohibited peddlers from standing in one place for more than 10 minutes, except when effecting a sale.

. Use groups 1 through 4 embrace residential and institutional uses; use groups 5 through 9 embrace local retail and service uses; use groups 10 through 12 include large retail establishments and large entertainment facilities; use groups 13 through 15 intend waterfront/recreation uses; use group 16 intends heavy automotive service, and use groups 17 and 18 are industrial uses. (See generally NY City Zoning Resolution arts II, III, IV)

. Plaintiffs do not own the locations where they want to dance, and thus cannot claim that they have been deprived of any property right. However, the City does not argue that plaintiffs lack standing to challenge the Zoning Resolution.

. An attorney who has represented bars and restaurants on noise complaints sees no connection between excess noise and the presence or absence of dancing at an establishment, and no connection between excess noise and a cabaret license. (Sharma affirmation If 2.)

. Plaintiffs also make arguments that the zoning restrictions are unconstitutional restrictions upon their freedom of expression, but these arguments are unavailing because participatory social dancing is not constitutionally protected expression.

. Moreover, where the City’s policy judgment on a given use’s location is debatable, the separation of powers doctrine constrains the court to refrain from substituting its judgment for that of the policymaking branches of government. Conversely, even if the City’s policy determination must be sustained as a matter of law, that does not mean that it should not continue to be debated, as a matter of policy, in the appropriate fora.

. As plaintiffs point out, obtaining a cabaret license involves a bureaucratic process that may require a costly investment for an establish *485 ment, and establishments that offer social dancing may be expensive, or may cater to less popular forms of social dancing.